```
 1              UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   COTTAGE HEALTH SYSTEM, ET AL.,        )
                                           )
 6                    PLAINTIFFS,          ) CASE NO.
                                           ) CV 15-2198
 7          VS.                            )
                                           )
 8   ADMIRAL INSURANCE COMPANY, ET AL.,    )
                                           )
 9                    DEFENDANTS.          )
     _____)
10

11

12

13

14                   REPORTER'S TRANSCRIPT OF
                       PRETRIAL CONFERENCE
15                   MONDAY, MARCH 28, 2016
                            2:27 P.M.
16                   LOS ANGELES, CALIFORNIA

17

18

19

20

21

22       _____

23

              MAREA WOOLRICH, CSR 12698, CRR
24          FEDERAL OFFICIAL COURT REPORTER
          255 EAST TEMPLE STREET, ROOM 181-K
25          LOS ANGELES, CALIFORNIA 90012
                mareawoolrich@aol.com
```

1   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFFS:**

4       KASOWITZ BENSON TORRES & FRIEDMAN LLP
        BY:  JEROLD OSHINSKY
5       LINDA KORNFELD
        KIRSTEN JACKSON
6       2029 Century Park East, Suite 750
        Los Angeles, CA 90067
7

8   **FOR THE DEFENDANTS:**

9       SELMAN BREITMAN LLP
        BY:  ELDON EDSON
10      LAURA RAMOS
        11766 Wilshire Boulevard, 6th Floor
11      Los Angeles, CA 90025

12      HALL BOOTH SMITH PC
        BY:  DREW GRAHAM
13      191 Peachtree Street NE, Suite 2900
        Atlanta, GA 30303

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, MARCH 28, 2016

 2                            2:27 P.M.

 3                             -oOo-

 4

 5          THE CLERK:  Calling Item No. 11 on the Court's

 6   calendar, CV 15-2198, Cottage Health System, et al., versus

 7   Admiral Insurance Company, et al.

 8        Counsel, please state your appearances for the record.

 9          MR. EDSON:  Good afternoon, Your Honor.  Eldon Edson

10   for Defendant and Counter-claimant Admiral Insurance Company.

11          MS. RAMOS:  And Laura Ramos for Defendant Admiral

12   Insurance Company.

13          MR. GRAHAM:  Drew Graham for Defendant Admiral

14   Insurance Company.

15          MR. OSHINSKY:  Good afternoon, Your Honor.

16   Jerold Oshinsky for the Plaintiff Santa Barbara Cottage

17   Hospital and the Cottage Health System.

18          MS. KORNFELD:  Linda Kornfeld on behalf of Cottage

19   as well.

20          MS. JACKSON:  Kirsten Jackson on behalf of Cottage.

21          THE COURT:  Could I first address plaintiffs'

22   counsel at the lectern, please?  Whoever -- I've looked through

23   the docket, and I don't think I've missed it, but did the

24   parties submit a pretrial conference order?

25          MS. KORNFELD:  Yes, Your Honor.
```

```
 1            THE COURT:  When was it -- what's the docket number?
 2            MS. JACKSON:  Let's see.
 3            MS. KORNFELD:  It was submitted on Monday last week.
 4            MS. JACKSON:  Yes.
 5            THE COURT:  What's the docket number?
 6            MS. KORNFELD:  One second, Your Honor.
 7            MS. JACKSON:  I have it right here.  It was -- I
 8    believe it was lodged with the Court --
 9            THE COURT:  Please stand.
10            MR. OSHINSKY:  He's looking for the docket number.
11            THE COURT:  What is the docket number though?
12            MS. JACKSON:  There is -- it is missing a docket
13    number.
14            THE COURT:  Okay.  The first thing -- let's go back
15    to the lectern for a series of questions.
16       Okay.  The first thing I wanted to look at is the pretrial
17    conference order, and I saw it.  There's a trial estimate from
18    the plaintiffs of three to five days, and then there's a trial
19    estimate from the defense for seven days; is that correct?
20            MS. KORNFELD:  Yes, Your Honor.
21            THE COURT:  So I was having difficulty evaluating
22    the length of trial because of the manner in which the joint
23    witness list was prepared.
24            MS. KORNFELD:  Yes, Your Honor.
25            THE COURT:  And broken down into plaintiffs' -- I
```

```
1   believe plaintiffs' witnesses and then defense witnesses.  But
2   with regard to the plaintiffs' witnesses identified, there's
3   not any explanation as to what they are going to testify about.
4   So I don't -- can't make a determination whether it's
5   duplicative or not.  Is there any reason why that wasn't done?
6              MS. KORNFELD:  Your Honor, on the witness list that
7   we submitted as to our witnesses, we've identified in bullet
8   points the categories about which they are going to testify.
9        In light of the Court's ruling, it's our expectation that
10  our case in chief is actually fairly short.  And when I speak
11  of the Court's ruling, I mean the Court's ruling on summary
12  judgment.
13             THE COURT:  Right.
14             MS. KORNFELD:  For purposes of our case in chief,
15  there's the question of whether defense fees are covered, and
16  we believe that the Court's ruling in light of California law
17  has resolved that issue having determined that the defense view
18  language is susceptible -- reasonably susceptible to our
19  interpretation.  We think to the extent that the Court --
20             THE COURT:  I don't think my order says that.
21             MS. KORNFELD:  The order --
22             THE COURT:  I think I said there's triable issues of
23  fact, but I didn't say -- in fact, I think the position of the
24  plaintiffs is weak as it relates to recovery of attorneys'
25  fees.  I don't think -- my order wasn't intended -- maybe I
```

```
 1    need to rewrite it.  But my order wasn't intended to simply
 2    mean the plaintiff prevailed on attorneys' fees in the
 3    underlying action.  In fact, I think the position is quite
 4    weak.
 5              MS. KORNFELD:  Your Honor, in the order -- and I can
 6    get the order and quote from it.
 7              THE COURT:  Right.  The parties never argued -- one
 8    of the interesting things about it, the parties never argued in
 9    their briefing papers that ambiguities are construed in favor
10    of the insured.  I understand that's the law in California.
11    But it wasn't my intention in that ruling to make a
12    determination that the plaintiffs were, in fact, entitled to
13    attorneys' fees.  In fact, if I was making the call on a court
14    trial, I would say you were not.
15              MS. KORNFELD:  Your Honor, the order on page 19,
16    Your Honor does state that, "The Court believes the defendants'
17    reading of the 2007/'08 policy is more natural.  It also finds,
18    however, that the policy is reasonably susceptible to the
19    plaintiffs" --
20              THE COURT:  But you never argued in your papers the
21    California law that you are now relying on.  You never
22    said that -- is that what you're saying basically?  An
23    ambiguity should be construed in favor of the insured.
24              MS. KORNFELD:  Yes, Your Honor, in light of the
25    language that we are addressing --
```

1          THE COURT:  Did you mention that in your brief?

2          MS. KORNFELD:  We opposed the motion for summary

3   judgment.  We did not move affirmatively, Your Honor.  But in

4   light of the Court's ruling --

5          THE COURT:  Don't -- well, then I need to reconsider

6   the ruling because don't consider the ruling as an award of

7   attorneys' fees for the plaintiff.  That was not my intent.  I

8   need to rewrite it if you believe California law mandates that.

9   But it was simply denial of the summary judgment motion.

10       My personal view is that the policy -- defendants'

11   position as it relates to attorneys' fees is the right

12   position.  But so -- you didn't move for summary judgment on

13   it.  And that wasn't my intent to claim that you would win on

14   attorneys' fees.  Maybe I need to reword it or reconsider the

15   order so it's not ambiguous.  But certainly --

16          MS. KORNFELD:  Your Honor -- I'm sorry.

17          THE COURT:  But certainly my view is that the

18   plaintiffs' position on recovery of attorneys' fees is quite

19   weak.

20          MS. KORNFELD:  Your Honor, under California law --

21          THE WITNESS:  I understand that.  You didn't argue

22   it.  You didn't bring a cross-motion for summary judgment.

23          MS. KORNFELD:  Yes, Your Honor, that's correct.

24          THE COURT:  I was concerned the way the order was

25   written when it was sent out, but there was not a cross-motion

```
 1    for summary judgment.  So don't interpret my ruling as a
 2    granting of a summary judgment that was never brought.
 3              MS. KORNFELD:    Correct, Your Honor.  And we are
 4    not interpreting your ruling in that regard.  We understand
 5    your ruling to be stating that there are two different
 6    interpretations being presented to the Court with respect to
 7    the language in the policy and that you have ruled that our --
 8    our interpretation, the language is at least reasonably
 9    susceptible to that interpretation.
10        As a result, the language is ambiguous, and therefore, you
11    have ruled that we may then turn to extrinsic evidence to
12    determine --
13              THE COURT:  Right.
14              MS. KORNFELD:  -- objectively reasonable
15    expectations of the parties, and that issue was sent to the
16    jury to ascertain with respect to that evidence what it means
17    and whether our interpretation is reasonable.
18              THE COURT:  Right.  It was my view that the
19    extrinsic evidence was quite weak.  But that's just my view.
20    Let the jury decide.
21              MS. KORNFELD:  Yes, Your Honor.
22              THE COURT:  But -- so anyway, but in light of that,
23    I was confused about the witness list because the blocks of
24    just five hours, five hours, ten hours, ten hours, and I
25    thought we are going to try this case for weeks.  But that's
```

```
 1   not your view?
 2              MS. KORNFELD:  No, Your Honor.  Having received your
 3   ruling on summary judgment and focusing the issues with respect
 4   to what the jury will be addressing --
 5              THE COURT:  Right.
 6              MS. KORNFELD:  -- we believe that the number of
 7   witnesses that will be necessary and the amount of time that
 8   will be necessary will be shorter than what is estimated on our
 9   witness list.
10        But I just want to clarify, with respect to each of the
11   witnesses, we did identify the categories about which they will
12   be testifying.  The case addresses defense fee coverage, and it
13   addresses coverage for the settlements.  And we've identified
14   with respect to these witnesses which topic they'll be
15   addressing.
16              THE COURT:  At this point in time, how long do you
17   think your direct case will be exclusive of cross?
18              MS. KORNFELD:  Three days, Your Honor.
19              THE COURT:  That's then probably five or six days if
20   you are saying three to five --
21              MS. KORNFELD:  Yes, Your Honor, two to three days
22   for our case in chief.
23              THE COURT:  How long did the parties spend with
24   regard to the preparation of the exhibit list?  Because it
25   doesn't seem -- I mean, the list is long, but everything is
```

```
 1   objected to.  So I'm wondering why is everything objected to,

 2   most everything it seems like.  It doesn't seem like the

 3   parties -- did the parties meet and confer about admissibility,

 4   or was it just a list to preserve purported objections?

 5           MS. KORNFELD:  Your Honor, the parties did talk

 6   through the exhibits.  We plan to continue to talk through the

 7   exhibits.

 8      The rulings on the summary judgment motion and the motions

 9   in limine will further assist the parties in narrowing concerns

10   about the exhibits or which exhibits, in fact, are relevant.

11   And we are willing to spend whatever time is necessary to

12   continue to work through the list in light of the recent ruling

13   last week and the forthcoming motions in limine rulings.

14           THE COURT:  There was also -- there's a couple

15   statements -- both sides did it -- basically we reserve our

16   right to add or remove witnesses.  But trust me, if the witness

17   isn't on the final witness list, that witness doesn't exist.

18   There's no rights reserved unless it's impeachment.

19      There's also a statement here about additional depositions

20   that are scheduled to be taken in this matter.  What's the

21   status of that?

22           MS. KORNFELD:  Your Honor, the expert -- there are

23   two experts, both on the question of bad faith.  And those

24   expert depositions happened last week.  There is about an hour

25   and a half, I believe, remaining on the deposition of our
```

```
 1   expert.
 2              THE COURT:  Why is -- I thought I ordered that
 3   expert discovery be done March 1st.  Why are the parties still
 4   conducting depositions?
 5              MS. KORNFELD:  The parties agreed to address -- in
 6   light of the schedule and the other filings in the case, the
 7   parties agreed to address the expert witness depositions --
 8              THE COURT:  You just ignored my order just because
 9   the parties could agree to ignore my order?
10              MS. KORNFELD:  No, Your Honor.  We probably should
11   have submitted that to you.
12              THE COURT:  That's right.  And let me tell you this.
13   Discovery is over.  No more discovery.  I don't care if the
14   parties have agreed.  There is no more depositions in this case
15   because it creates problems for trial preparation because depos
16   should have been done March 1st.  So despite that you've
17   agreed, if I find out there's discovery going on after a
18   discovery order, someone is going to get sanctioned.  So
19   discovery is over.
20              MS. KORNFELD:  Okay.
21              THE COURT:  If you are trying the case today, in
22   terms of your assessment of -- let's just talk about damages.
23   What's your assessment of damages in this case if you were
24   trying the case today, and how would you break at that down?
25              MS. KORNFELD:  Defense fees, Your Honor.  There are
```

```
 1    buckets.  It's the defense fees, it's the settlements, and then
 2    it would be any award with respect to our bad faith claim.
 3               THE COURT:  Okay.  So that -- okay.  So what are
 4    the -- I wanted to talk about specific numbers from the
 5    plaintiffs' position.  What was the position with regard to
 6    attorneys' fees damages?
 7               MS. KORNFELD:  With respect to the underlying
 8    matter, Your Honor?
 9               THE COURT:  Yes.
10               MS. KORNFELD:  It's about 3.77 million.
11               THE COURT:  Okay.  And then the settlement?  I
12    should know this.  A million?
13               MS. KORNFELD:  Your Honor, it's 1.2 -- there are two
14    settlements.
15               THE COURT:  Right.
16               MS. KORNFELD:  A $950,000 settlement in 2012 and a
17    settlement after trial in 2014.  The settlement after trial was
18    1.5 million.  And it's our position that the -- in light of the
19    applicable policy retention, we are entitled to the 1.5 plus
20    40.  So 1.54.
21               THE COURT:  Okay.  And if you argue today, what
22    would you argue in terms of bad faith?
23               MS. KORNFELD:  I'm sorry, Your Honor?
24               THE COURT:  What would you argue as towards bad
25    faith and punitive?  What would your position be today?
```

1        MS. KORNFELD:  Your Honor, with respect to bad

2  faith, it's the attorneys' fees that we've incurred as coverage

3  counsel.

4        THE COURT:  Would that be my motion afterwards under

5  *Brandt*?

6        MS. KORNFELD:  That's part of the case in chief.

7  That gets decided by the jury in the case in chief.  It's not

8  bifurcated.  And it's about $800,000, I believe.  And is that

9  accurate?

10        MS. JACKSON:  I --

11        MS. KORNFELD:  The last month has been very busy,

12  and we don't have that bill yet.

13        THE COURT:  Okay.

14        MS. KORNFELD:  But then with respect to punitive

15  damages, that is a second phase for the jury.

16        THE COURT:  What are your thoughts about that today?

17        MS. KORNFELD:  Your Honor, the multiplier in

18  California has been modified over the years.  I'd say probably

19  a four-to-one multiplier is something that we would argue would

20  be appropriate and supported.

21        THE COURT:  Have there been -- again, not disclosing

22  what's been discussed in the settlement discussions, has there

23  been settlement discussions?

24        MS. KORNFELD:  Your Honor, the parties met before

25  private mediator John Bates about six weeks ago.  At the

```
 1    mediation it was determined that because of the issues that

 2    were being addressed by motion for summary judgment at that

 3    point and the reply brief had not yet been filed and obviously

 4    the Court had not yet ruled, the parties decided that -- or the

 5    mediator decided that it would be more productive for the

 6    parties to come back and have --

 7              THE COURT:  The mediator decided?

 8              MS. KORNFELD:  The mediator suggested to the parties

 9    that it may be more productive for the parties to come back and

10    have a discussion after the Court ruled on the summary judgment

11    motion.  We had had outreach from the Court ADR judge with

12    respect to what the parties would be willing to do or

13    interested in doing with respect to a court-appointed mediator

14    or private mediator.

15        And since the Court ruled on the summary judgment motions,

16    we've had some dialog amongst the parties as to whether we

17    should consider returning to John Bates, who was the mediator

18    we appeared before a few weeks ago, to try to resolve the case.

19        There was some suggestion that we may try to find someone

20    who would be stronger and able to more effectively move the

21    parties to where we need to be to settle.  And there was a

22    discussion -- a suggestion by Admiral of another individual.

23    We agreed that that individual would be someone that we'd be

24    willing to mediate in front of.

25              THE COURT:  Who was that?
```

1             MR. EDSON:  Robert Kaplan, Your Honor.  We have

2     inquired, and unfortunately Mr. Kaplan is not available for the

3     next three months.

4             MS. KORNFELD:  So that became an issue, Your Honor.

5     But we --

6             THE COURT:  I mean, I think he'd be perfect for this

7     case actually.

8             MR. EDSON:  He's terrific.

9             THE COURT:  He's terrific.

10            MS. KORNFELD:  Maybe a phone call from the judge.

11            THE COURT:  I don't know.  He's busy.  I mean, he

12    would be almost perfect for this case.  I'm thinking of the

13    same person.  San Diego-based though?

14            MR. EDSON:  Yes, Your Honor.  He's also an insured's

15    counsel like Mr. Oshinsky here.  In fact, I think he was the

16    policyholder attorney who brought us the *Brandt* fee case.

17    We've mediated numerous cases in front of him, and he does a

18    great job with difficult cases.

19            MR. OSHINSKY:  We'd be very happy with him,

20    Your Honor.

21            THE COURT:  It would be great.  I mean, in a prior

22    life, I was associated counsel with him on a couple of cases.

23    That's over 20 years ago.  But he would be perfect.  Okay.  But

24    he's not --

25            MR. EDSON:  We inquired, I think it was on Friday --

1    am I thinking right -- and I was told by my secretary that he

2    was booked for three months.

3          MR. OSHINSKY:  Even if he could give us a few hours

4    to talk on the phone, that would be a start.  I don't know.  We

5    are happy to try him.

6          MR. EDSON:  I don't think -- if I may speak,

7    Your Honor.

8          THE COURT:  Yes.

9          MR. EDSON:  My sense, given the complexity of the

10    issues, this isn't a few hours on the telephone.  This is a

11    significant mediation session.

12          THE COURT:  I agree with you.  But it really helps

13    with someone like Rob Kaplan's experience as it relates to

14    insurance litigation and policy language and what cases are --

15    how cases are valued.  That's why I think you are probably

16    right, more than just a few hours of phone calls, but it's

17    surely going to save quite a bit of time -- he's going to read

18    the summary judgment motion and your briefs, and he's going to

19    know exactly where this case -- he's going to know something

20    about this case that none of us know in the room.  He'll bring

21    that expertise.

22      Somebody else who I thought of -- I mean, I don't know if

23    you -- he hasn't been doing mediation that long.  Do either of

24    you sides know Bruce Friedman?

25          MR. EDSON:  I'm sorry, Your Honor?

1           THE COURT:  Bruce Friedman.  Have any of you done

2    work with Bruce Friedman?

3           MS. KORNFELD:  Yes, Your Honor, I know

4    Bruce Friedman.

5           MR. OSHINSKY:  Yes, we do.

6           THE COURT:  Defense?

7           MR. EDSON:  I do not, Your Honor.

8           THE COURT:  I think he has the kind of expertise --

9    Mr. Kaplan has been doing mediation longer than Mr. Friedman,

10   but he has that same kind of expertise.  I mean, i think he's

11   represented insureds and insurance companies in a prior life.

12          MS. KORNFELD:  He's been in the business for a long

13   time.  And so while he hasn't been a mediator as long, he

14   certainly, I believe, would grasp the issues.

15          THE COURT:  I kind of like him since he was a

16   managing partner when I was hired as an associate.  But I

17   should disclose that.  So -- but that was 30 years ago so --

18          MR. OSHINSKY:  Can you bring him in?

19          THE COURT:  I see him at ABTL events and things like

20   that.  That's how I know he's now mediating.  But it just -- I

21   think it's a case that should be settled.  I think there's

22   strengths and weaknesses.  I've started -- I can work on both

23   sides easily well.  I mean, I think there's problem with the

24   defense fees.  I think there's issues to be talked about in

25   terms of allocation as it relates to how the case was settled.

```
 1              MS. KORNFELD:  Yes, Your Honor.

 2              THE COURT:  You know, both of you, both sides know

 3    these issues.  I would say this.  As a multiplier, different

 4    than state court.  I don't -- you might argue for four-to-one,

 5    but I don't think a federal jury is going to give you -- is

 6    going to -- it just depends who you get in the box; right?  You

 7    only have three peremptories a side.  So you just don't know.

 8         But I'm not sure they are going to get that excited about

 9    the case to award a punitive damages multiplier.  I don't think

10    that's necessarily news in terms of how federal juries go.

11         So I think there's -- Mr. Kaplan or whoever are going to

12    say these things and they're going to say bad things to the

13    defense as well, because there is stuff to be -- I mean, we

14    highlighted some of it.  You know, the parties were in fierce

15    communication throughout the litigation.  But then you have

16    correspondence that says no more correspondence would be

17    helpful.  So everybody has things to talk about.  You know

18    that.

19              MS. KORNFELD:  Your Honor, I should say that we

20    have -- the parties do work well together, and I think we

21    understand the issues on both sides.

22              THE COURT:  Yeah.

23              MS. KORNFELD:  We just need someone who will be

24    effective in --

25              THE COURT:  Maybe talking to the clients.
```

1          MS. KORNFELD:  -- clients as well and making sure

2    the clients understand the issues and there's a fulsome dialog

3    about the strengths and weaknesses on both sides.  So a strong

4    mediator will be important.

5          THE COURT:  What do you think -- it won't hurt my

6    feelings.  What do you think about the case -- I mean, I'll let

7    the defense do their due diligence about Bruce Friedman as a

8    potential mediator in this case.

9          MS. KORNFELD:  Your Honor, my view is that, if the

10   other side is comfortable with a mediator, then I'm comfortable

11   with a mediator.  I am comfortable with Bruce Friedman, and

12   if --

13         THE COURT:  Both sides have to be.  I think

14   everybody -- both sides jumped on Mr. Kaplan for good cause.

15   So both sides have to jump on board with Mr. Friedman.

16     How much time would you need -- I don't think even a phone

17   call from me I'm going to get him, unless he has a cancelation

18   that we don't know about.

19         MR. EDSON:  Your Honor, obviously if the Court is

20   encouraging us to speak with Mr. Friedman, mediate with

21   Mr. Friedman, we would only need a day or two to do a due

22   diligence.  The question is, as with a lot of good mediators,

23   his schedule and availability, whether he'd be booked up, and

24   we just don't know that, I think, at this point.

25         THE COURT:  Let me -- then I want the parties to

```
 1  work -- submit a few other things that are a little different.
 2       Here's my problem.  I'm starting trial tomorrow for two
 3  weeks.  Then I'm gone for a week.  And then I've got two civil
 4  cases trailing, one on the 29th, and this would be the second
 5  case that's trailing.  So realistically I can't try this case
 6  until May 17th or May 24th.  So that gives you some time to
 7  stop the presses and to talk to each other some more with the
 8  clients.
 9       Did you get any indication -- I mean, did you get any
10  sense from Mr. Kaplan's office that he is solid booked for
11  three months or if he had some openings that if he got a call
12  from somebody, he might take it on?
13            MR. EDSON:  Your Honor, unfortunately I did not
14  speak with their office.  I mean, I get along very well with
15  Mr. Kaplan, and I'm happy to call him myself to see if he could
16  possibly work us in.  Through my secretary, I heard he's booked
17  for three months.  He sometimes will have a cancelation and can
18  put people in.
19       I also know in the past he's done this sort of informal
20  mediation thing where he works the phones and -- as I said, I
21  don't know if this is the right case for that.  But maybe we
22  could --
23            THE COURT:  I think it depends where your clients
24  are at probably, doesn't it?  I mean, it's probably -- I
25  suspect that you're -- without telling each other where you are
```

UNITED STATES DISTRICT COURT

```
 1    at, you probably are pretty close but your clients aren't maybe
 2    there yet, ready, either side.  That's my guess.  Because both
 3    sides have a lot of experience.  So I think you both understand
 4    your case and what the value is.  And maybe either side the
 5    clients need to be persuaded in one way or another.
 6             MS. KORNFELD:  I have been in mediation five times
 7    already this year, and they've all settled at midnight.  So my
 8    experience is that unless you are all in the room and you are
 9    there for a long time, nothing much happens.  So I would think
10    a full day session in person would be necessary to accomplish a
11    settlement goal here.
12             THE COURT:  I can't disagree.  Can you try -- let's
13    take a short break.  Can you try calling Mr. Kaplan's office to
14    see if there's something available?  And if it would help, I'd
15    be happy to talk to him.
16             MR. EDSON:  Okay.  I certainly will, Your Honor.
17             THE COURT:  Let's break for a few minutes.
18             MS. KORNFELD:  Thank you, Your Honor.
19             MR. EDSON:  Thank you, Your Honor.
20             (A brief recess was taken.)
21             THE CLERK:  Recalling Cottage Health Systems,
22    et al., versus Admiral Insurance Company.
23         Counsel, please restate your appearances for the record.
24             MR. OSHINSKY:  Jerold Oshinsky, Your Honor, for the
25    plaintiffs.
```

1          MS. KORNFELD:  Linda Kornfeld on behalf of Cottage.

2          MR. EDSON:  Eldon Edson on behalf of the Admiral

3  Insurance Company.

4          MS. RAMOS:  Laura Ramos on behalf of Admiral

5  Insurance Company.

6          MR. GRAHAM:  Drew Graham for Admiral.

7          THE COURT:  And do you have a report?

8          MR. EDSON:  Yes, Your Honor.  I spoke with

9  Rob Kaplan's office, and it's their expectation that they are

10  going to have an opening on April 13th.  They will know at the

11  end of today if that's open.  But his assistant believes that

12  it will be open.

13      And so assuming that it works with the parties, you know,

14  we'd like to go see Rob, I think.  I think that would be a good

15  way to go.

16          THE COURT:  Okay.  Do you have a backup plan if he

17  doesn't cancel?  Do you have a backup plan if Mr. Kaplan can't

18  do it?

19          MR. EDSON:  We don't at this point, but we will.  If

20  he can't do it, we'll all agree on someone else, and we'll go

21  see someone before the trial date, whenever it is, in May.

22          THE COURT:  Okay.  So let's continue the trial date

23  to May 24th at 9:00 o'clock.  Pretrial conference May 9th,

24  2016.

25      I'd like to see the exhibit list and the witness list

1    amended to reflect the current conditions and consistent with

2    whatever I decide, whether it's a seven-day case, a three-day

3    case, a four-day case, just more in line with that so I have a

4    better understanding of what's repetitious or not.  And if the

5    parties would work more closely, not necessarily with the

6    mindset of preserving objections but pointing out to the Court

7    where the serious disagreements are.

8            All right.  Thank you.

9            MR. OSHINSKY:  Your Honor, could I say one thing for

10   the record?  So it not be thought otherwise, we like

11   John Bates, and we thought he was a fine gentleman, perhaps not

12   for this case, but we would certainly consider him in the

13   future.  We thought he was a very fine gentleman.

14           THE COURT:  I just thought -- what we said earlier,

15   I think it's a niche case, and I think you need somebody who

16   understands, will read the papers, the parties' position, the

17   Court's order and kind of figure out everybody's strengths and

18   everybody's problems and could be -- and who would have

19   credibility in assessing that and talking through the case with

20   the parties.  But, yeah, I just think Mr. Kaplan would be

21   perfect for this case as mentioned.

22           MR. OSHINSKY:  As Ms. Kornfeld said, we like any

23   mediator they like.

24           THE COURT:  Okay.

25           MR. EDSON:  Your Honor, there is one other thing

```
1    with regard to pretrial deadlines.  I just -- even with the
2    continuance of the trial date, I'd just like to confirm my
3    assumption, that, for example, the motion in limine replies
4    will still be due this Friday.  We are not kicking everything
5    down the road.  Is that correct, or am I incorrect?
6              THE COURT:  Well, I mean, what's going to help the
7    parties talk more on the 13th?  Tell me.
8              MR. EDSON:  To be honest, I think we should get all
9    of the -- I think we should --
10             THE COURT:  Just finish the work and get ready --
11             MR. EDSON:  Let's finish the work, see what everyone
12   has to say, and then we can move forward with this next step.
13             THE COURT:  Okay.
14             MS. KORNFELD:  Your Honor, if I can just chime in on
15   that.  I agree that filing our motions in limine reply --
16   motions in limine reply this Friday would be helpful.  We also
17   have dates, deadlines with respect to exchange of graphics and
18   things like that.  I would suggest that we put those types of
19   deadlines off so that the parties aren't spending time
20   preparing for trial when we should be focused on mediating.
21             THE COURT:  The motion in limine is due Friday, and
22   then everything else is delayed based on the new trial date.
23             MR. EDSON:  That's agreeable.  Thank you,
24   Your Honor.
25             MS. KORNFELD:  Thank you, Your Honor.
```

1        THE CLERK:  What's the time for the pretrial

2  conference?

3        THE COURT:  2:30.

4        THE CLERK:  Thank you.

5        MR. EDSON:  Thank you, Your Honor.

6        MS. KORNFELD:  Thank you, Your Honor.

7        (At 3:34 p.m. the proceedings adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5               I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

 6     REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

 7     CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

 8     TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

 9     IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10     REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11     THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                              DATED THIS  31ST  DAY OF MARCH, 2016.

16

17

18                              /S/ MAREA WOOLRICH

19                              MAREA WOOLRICH, CSR NO. 12698, CRR
                                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**